No. 22-2621

---

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE SEVENTH CIRCUIT

---

G.G., a Minor, and Deanna Rose, Parent and Guardian of G.G.,

*Plaintiffs-Appellants,*

v.

SALESFORCE.COM, INC.,

*Defendant-Appellee.*

---

On Appeal from the U.S. District Court For the Northern District of Illinois
Case No. 1:20-CV-02335 – Hon. Andrea R. Wood

---

## APPELLEE'S ANSWERING BRIEF

---

Patricia Brown Holmes
Lucas T. Rael
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, IL 60602
Telephone:  (312) 472-8700
pholmes@rshc-law.com
lrael@rsch-law.com

Bradley J. Hamburger
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  (213) 229-7658
bhamburger@gibsondunn.com

Kristin A. Linsley
*Counsel of Record*
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Telephone:  (415) 393-8395
klinsley@gibsondunn.com

Andrew P. LeGrand
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone:  (214) 698-3100
alegrand@gibsondunn.com

*Counsel for Appellee Salesforce, Inc. (formerly known as salesforce.com, inc.)*

# DISCLOSURE STATEMENT

The undersigned counsel of record for Salesforce, Inc. (formerly known as salesforce.com, inc.) hereby furnishes the following information in accordance with Rule 26.1 of the Federal Rules of Appellate Procedure and Rule 26.1 of the Circuit Rules of the U.S. Court of Appeals for the Seventh Circuit:

**(1)** **The full name of every party or amicus the attorney represents:**

Salesforce, Inc. (formerly known as salesforce.com, inc.)

**(2)** **If such party or amicus is a corporation:**
  **(i)** **Its parent corporation, if any:** None
  **(ii)** **A list of stockholders that are publicly-held companies owning 10% or more of stock in the party:** None

**(3)** **The names of all law firms whose partners or associates have appeared for the party in the case or are expected to appear for the party in this Court:**

Gibson, Dunn & Crutcher LLP
Riley Safer Holmes & Cancila LLP

Dated: December 5, 2022

By:　_/s/ Kristin A. Linsley_
　　　Kristin A. Linsley

i

# TABLE OF CONTENTS

I.  INTRODUCTION ................................................................ 1

II.  STATEMENT OF THE ISSUES .................................................. 7

III.  JURISDICTIONAL STATEMENT ................................................ 8

IV.  STATEMENT OF THE CASE .................................................... 8

    A.  Plaintiffs' Allegations ................................................ 8

    B.  The District Court's Orders ........................................... 14

V.  SUMMARY OF ARGUMENT ...................................................... 18

VI.  STANDARD OF REVIEW ...................................................... 22

VII.  ARGUMENT ................................................................ 22

    A.  The District Court Correctly Held That Section 230 Bars Plaintiffs' Claim Against Salesforce ................................... 22

        1.  Plaintiffs' Claim Would Treat Salesforce as the Publisher or Speaker of Third-Party Content .......... 24

        2.  Salesforce Is a Provider of an "Interactive Computer Service" ....................................... 32

        3.  Courts Have Resoundingly Rejected Plaintiffs' Reading of FOSTA's Exemption ................................. 38

    B.  Even If Section 230 Did Not Apply, the Court Still Would Have to Affirm Because Plaintiffs Do Not Allege a Plausible Violation of Section 1595 ................................... 52

        1.  Plaintiffs Fail to Allege That Salesforce Participated in a Venture That Trafficked G.G. ....... 53

2. Plaintiffs Do Not Allege That Salesforce Knew, Or Should Have Known, About G.G.'s Specific Trafficking ...................................................................... 65

3. Plaintiffs Do Not Allege That Salesforce Knowingly Received a Benefit From the Venture That Trafficked G.G. ................................................... 70

VIII. CONCLUSION ................................................................................. 73

# TABLE OF AUTHORITIES

## CASES

*A.B. v. Marriott Int'l, Inc.*,
   455 F. Supp. 3d 171 (E.D. Pa. 2020) .................................................... 68

*A.M. v. Omegle.com, LLC*,
   2022 WL 2713721 (D. Or. July 13, 2022) ........................................... 45

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ............................................................22, 62, 63, 65

*B.M. v. Wyndham Hotels & Resorts, Inc.*,
   2020 WL 4368214 (N.D. Cal. July 30, 2020) ...........................57, 67, 70

*Backpage.com, LLC v. Dart*,
   807 F.3d 229 (7th Cir. 2015).................................................9, 10, 60, 72

*Barnes v. Yahoo!, Inc.*,
   570 F.3d 1096 (9th Cir. 2009)............................................................... 25

*Batzel v. Smith*,
   333 F.3d 1018 (9th Cir. 2003)............................................................... 50

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................62, 63

*Beyond Systems, Inc. v. Keynetics, Inc.*,
   422 F. Supp. 2d 523 (D. Md. 2006)....................................................... 36

*Bilski v. Kappos*,
   561 U.S. 593 (2010) ............................................................................... 34

*C.I.R. v. Lundy*,
   516 U.S. 235 (1996) ............................................................................... 39

*Chicago Lawyers' Comm. for Civ. Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008)....................18, 22, 24, 26

*Cohen v. Facebook, Inc.*,
   252 F. Supp. 3d 140 (E.D.N.Y. 2017), ................................................. 27

*Daniel v. Armslist, LLC,*
    926 N.W.2d 710 (Wis. 2019) ............................................................... 27

*Davis v. Motiva Enters., LLC,*
    2015 WL 1535694 (Tex. App. Apr. 2, 2015) ........................................ 35

*Day v. TikTok, Inc.,*
    2022 WL 595745 (N.D. Ill. Feb. 28, 2022) .......................................... 26

*Dix v. Edelman Fin. Servs., LLC.,*
    978 F.3d 507 (7th Cir. 2020) ............................................................... 23

*Doe #1 v. Red Roof Inns, Inc.,*
    21 F.4th 714 (11th Cir. 2021) .............................................. 21, 53, 56, 61

*Doe 3 v. Red Roof Inns, Inc.,*
    2020 WL 1872333 (N.D. Ga. Apr. 13, 2020) ....................................... 66

*Doe v. GTE Corp.,*
    347 F.3d 655 (7th Cir. 2003) ........................................................... 7, 60

*Doe v. Internet Brands, Inc.,*
    824 F.3d 846 (9th Cir. 2016) ............................................................... 29

*Doe v. Kik Interactive, Inc.,*
    482 F. Supp. 3d 1242 (S.D. Fla. 2020) ........................................... 26, 45

*Doe v. MySpace, Inc.,*
    528 F.3d 413 (5th Cir. 2008) ............................................................... 27

*Does #1-50 v. Salesforce.com, Inc.,*
    2021 WL 6143093 (Cal. Ct. App. Dec. 30, 2021) ............................ 28, 36

*Does 1-6 v. Reddit, Inc.,*
    51 F.4th 1137 (9th Cir. 2022) .... 5, 19, 30, 40, 41, 42, 43, 44, 45, 46, 47

*In re Facebook, Inc.,*
    625 S.W. 3d 80 (Tex. 2021) ............................................................ 31, 32

*FCStone Fin., Inc. v. Jacobson,*
    950 F.3d 491 (7th Cir. 2020) ............................................................... 49

*Fields v. Twitter, Inc.*,
   217 F. Supp. 3d 1116 (N.D. Cal. 2016) ................................................ 36

*Fields v. Twitter, Inc.*,
   881 F.3d 739 (9th Cir. 2018) .................................................................. 36

*Force v. Facebook, Inc.*,
   934 F.3d 53 (2d Cir. 2019) .................................................................... 25

*Geiss v. Weinstein Co. Holdings LLC*,
   383 F. Supp. 3d 156 (S.D.N.Y. 2019) .................................................... 71

*GoDaddy.com, LLC v. Toups*,
   429 S.W.3d 752 (Tex. App. Apr. 10, 2014) .......................................... 34

*H.H. v. G6 Hosp., LLC*,
   2019 WL 6682152 (S.D. Ohio Dec. 6, 2019) ........................................ 71

*J.B. v. G6 Hosp., LLC*,
   2020 WL 4901196 (N.D. Cal. Aug. 20, 2020) ...................................... 69

*J.B. v. G6 Hospitality, LLC*,
   2021 WL 4079207, at *4 (N.D. Cal. Sept. 8, 2021) ...................... 26, 45

*Jane Doe No. 1 v. Backpage.com, LLC*,
   817 F.3d 12 (1st Cir. 2016) ...................................................... 10, 32, 46

*L.H. v. Marriott Int'l, Inc.*,
   2022 WL 1619637 (S.D. Fla. May 23, 2022) ........................................ 44

*Lundstrom v. Choice Hotels Int'l, Inc.*,
   2021 WL 5579117 (D. Colo. Nov. 30, 2021) .................................. 66, 68

*M.A. v. Wyndham Hotels & Resorts, Inc.*,
   425 F. Supp. 3d 959 (S.D. Ohio 2019) .................................................. 71

*M.H. v. Omegle.com, LLC*,
   2022 WL 93575 (M.D. Fla. Jan. 10, 2022) .......................................... 26

*M.L. v. Craigslist, Inc.*,
   2020 WL 5494903 (W.D. Wash. Sept. 11, 2020) ............................ 45, 68

*OBB Personenverkehr AG v. Sachs,*
  577 U.S. 27 (2015) ................................................................. 40

*Parker Drilling Mgmt. Servs., Ltd. v. Newton,*
  139 S. Ct. 1881 (2019) ........................................................... 20

*PatentWizard, Inc. v. Kinko's, Inc.,*
  163 F. Supp. 2d 1069 (D.S.D. 2001) ...................................... 35

*Proft v. Raoul,*
  944 F.3d 686 (7th Cir. 2019) ................................................. 22

*S.J. v. Choice Hotels Int'l, Inc.,*
  473 F. Supp. 3d 147 (E.D.N.Y. 2020) .............................. 66, 67

*S.Y. v. Naples Hotel Co.,*
  476 F. Supp. 3d 1251 (M.D. Fla. 2020) ................................. 68

*Smith v. Trusted Universal Standards in Elec. Transactions, Inc.,*
  2011 WL 900096 (D.N.J. Mar. 15, 2011) ............................... 35

*Staples v. United States,*
  511 U.S. 600 (1994) ............................................................... 43

*Stayart v. Yahoo!, Inc.,*
  651 F. Supp. 2d 873 (E.D. Wis. 2009) ................................... 34

*Stayart v Yahoo!, Inc.,*
  623 F.3d 436 (7th Cir. 2010) ................................................. 34

*United States v. McClure,*
  854 F.3d 789 (5th Cir. 2017) ................................................. 40

*United States v. Melvin,*
  948 F.3d 848 (7th Cir. 2020) ................................................. 34

*United States v. Papagno,*
  639 F.3d 1093 (D.C. Cir. 2011) ............................................. 59

*United States v. Ron Pair Enters., Inc.,*
  489 U.S. 235 (1989) ............................................................... 38

*United States v. Tuggle*,
    4 F.4th 505 (7th Cir. 2021) .................................................. 51

*Yeftich v. Navistar, Inc.*,
    722 F.3d 911 (7th Cir. 2013)............................................... 63

*Zango, Inc. v. Kaspersky Lab, Inc.*,
    568 F.3d 1169 (9th Cir. 2009).......................................34, 37

**FEDERAL STATUTES**

18 U.S.C. § 1591(a) .............................................................. 66

18 U.S.C. § 1595..................................................21, 44, 52, 65

47 U.S.C. § 230........................... 5, 8, 16, 19, 20, 30, 33, 37, 39, 43, 44, 45

Telecommunications Act of 1996,
    Pub. L. No. 104-104, § 509, 110 Stat. 56 ............................ 45

**LEGISLATIVE MATERIALS**

Stop Enabling Sex Traffickers Act of 2017
    S. 1693, 115th Cong. § 3 (Aug. 1, 2017)............................... 46

Allow States and Victims to Fight Online Sex Trafficking Act of 2017
    H.R. 1865, 115th Cong. § 3 (Apr. 3, 2017) ........................... 46

164 Cong. Rec. H1278 (daily ed. Feb. 27, 2018)....................... 49

164 Cong. Rec. S1849-08 (daily ed. Mar. 21, 2018) ................. 48

S. Rep. No. 115-199 (2018) ...............................................46, 48

*The Latest Developments in Combating Online Sex Trafficking: Hearing
Before the Subcomm. on Commc'ns & Tech. of the H. Comm. on
Energy & Com.*, 115th Cong. (2018) .................................... 48

*The Stop Enabling Sex Traffickers Act of 2017: Hearing on S. 1693
Before the S. Comm. on Com., Sci. & Transp.*,
    115th Cong. (2017) .......................................................46, 47

**OTHER AUTHORITIES**

*Underlie*, American Heritage Dictionary (5th ed. 2016)..........................40

*Underlie*, Merriam-Webster Dictionary, (online ed.) *available at*
    https://www.merriam-webster.com/dictionary/underlie  ...................40

## REQUEST FOR ORAL ARGUMENT

Pursuant to Federal Rule of Appellate Procedure 34(a) and Seventh Circuit Rule 34(f), Salesforce requests oral argument as it believes that oral argument would substantially assist the Court in resolution of this appeal.

# I.    INTRODUCTION

Companies use a variety of commonplace business tools—cell phones, computers, software—to accomplish their work and manage their customer relationships.  If a business engages in unlawful activity, that does not mean the vendors of such tools are on the hook.  Any other rule would make vendors potentially liable for serious criminal activity (in this case, sex trafficking) in which they played no part.  And when claims seek to hold a provider of software liable for online content created, stored, or transmitted by third parties (as is true here), section 230 of the Communications Decency Act specifically forecloses them.

Salesforce sells online customer relationship management ("CRM") software that over 150,000 businesses and other entities worldwide use to keep track of their customer information and communicate with their customers.  Salesforce sold a subscription for a standard software package to Website Technologies, LLC, an affiliate of Backpage.com, LLC, which in turn operated the classified advertisements website backpage.com.  Plaintiffs allege that Backpage knowingly allowed that website to be used by traffickers to post classified ads for sex with minors, and that Plaintiff G.G. was a minor who was trafficked using such ads.

1

Plaintiffs do not allege that Salesforce or its software had anything to do with the content policies Backpage allegedly had in place that encouraged and facilitated the posting of the illegal ads that injured G.G. They also do not allege that Salesforce had any knowledge of any trafficker or act of trafficking, whether of G.G. or generally, via that website. Nor do they even allege that Salesforce's software was used in any way in connection with backpage.com or any ads posted thereon.

Instead, Plaintiffs' theory sweeps more broadly—far more broadly— than the federal trafficking statute they seek to invoke. Their core thesis is that Backpage used Salesforce's software in the same way other businesses do—to organize customer information and communicate with customers. As against Salesforce, the crux of their claim is that Backpage used Salesforce's software to expand its business by growing its customer base—and, because Backpage's customers must have included traffickers, that meant Salesforce's software (and therefore Salesforce itself) was helping Backpage grow a trafficking business. According to Plaintiffs' sole cause of action against Salesforce, this alleged use of Salesforce's customer relationship software makes

Salesforce itself liable for facilitating sex trafficking under the federal civil sex-trafficking statute, 18 U.S.C. § 1595.

Virtually all of Plaintiffs' allegations of misconduct by Salesforce are actually uses of the software *by Backpage*, including building a database of customer contacts that allegedly included traffickers, and using that database to send marketing email campaigns to customers and would-be customers, allegedly including potential traffickers. Beyond that, Plaintiffs allege that Salesforce provided routine technical support as part of the software package, and at some point sold the Backpage affiliate a separate license for use overseas—a transaction unrelated to G.G.'s own trafficking in Illinois but that Plaintiffs allege (without support) was meant to help Backpage "evade law enforcement" in the United States.  OB53.

The district court properly rejected Plaintiffs' attempt to hold Salesforce liable for the acts of third-party advertisers or traffickers with whom it had no relationship.  As the court correctly held, Plaintiffs' claim is barred by section 230, because it would hold Salesforce, an interactive computer service provider, liable for the harmful effects of third-party ads posted on backpage.com, solely because it sold business software to

an entity affiliated with that website's operator.  And as the district court further held, Plaintiffs' broader thesis—that Salesforce is liable because Backpage used Salesforce's software to communicate with and market to Backpage's customers—also falls squarely within section 230 because it would hold Salesforce liable for communications on its platform between Backpage and its customers.

Plaintiffs' arguments against the straightforward textual application of section 230 are without merit.  They first suggest that section 230 should be limited to defamation-type theories—a reading not endorsed by any court, including this one, and that finds no support in the broadly worded statutory text, which covers any claim that would treat an interactive computer service provider as a "publisher or speaker" of third-party content posted or transmitted online.

Plaintiffs also try to narrow the scope of section 230's "interactive computer service" definition by saying it applies only to platforms that actually *host* the third-party content that forms the basis for an underlying claim.  But that is not what the definition says—it expressly includes providers of "software," just like Salesforce.  And Plaintiffs' claim would be barred even under their narrower, atextual reading

because their principal theory is that Backpage used Salesforce's cloud-based software to organize its customer data and conduct marketing communications with current and potential customers—a classic application of section 230 involving just the type of hosting of third-party content that Plaintiffs admit is covered even under their reading.

Plaintiffs also are wrong that their claim is exempted from section 230 by the 2018 amendments that were part of the Allow States and Victims to Fight Online Sex Trafficking Act ("FOSTA"). The exemption Plaintiffs invoke applies to civil sex-trafficking claims "brought under section 1595 of title 18," but only if "the conduct underlying the claim constitutes a violation" of section 1591, the *criminal* sex-trafficking statute. 47 U.S.C. § 230(e)(5)(A). As the Ninth Circuit recently held in *Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1146 (9th Cir. 2022), FOSTA's text, context, and enactment history all confirm that this exemption applies only if the plaintiff can show that *the civil defendant*—here, Salesforce—itself engaged in conduct that constituted a violation of the criminal sex-trafficking statute. Because Plaintiffs concededly cannot make anything like that showing, the correct statutory reading—adopted

in *Reddit* and by the overwhelming majority of district courts across the country—disposes of their FOSTA argument.

The district court also was correct that, even if Plaintiffs' claim fell outside section 230 or were exempted by FOSTA, the facts they allege could not establish that Salesforce violated the federal civil sex-trafficking statute, 18 U.S.C. § 1595, by knowingly benefitting from participation in a venture it knew or should have known was involved in G.G.'s trafficking. Although the facts concerning G.G.'s ordeal are tragic, they have no legal or factual connection to anything Salesforce did.

Plaintiffs' complaint alleges no link between the online software Salesforce provided to Backpage's affiliate and either the backpage.com website or any of the classified ads posted on that site that allegedly led to the trafficking of G.G. (or anyone else). Plaintiffs actually *disclaim* any contention that Salesforce was connected to G.G.'s trafficker or that Salesforce (or its software) had anything to do with online ads, including for G.G. OB46-48. Instead, they seek to hold Salesforce liable because it sold software that Backpage used for customer organization and marketing purposes. This Court has rejected similar theories of liability seeking to penalize vendors who did nothing more than provide a lawful

commodity to their customers, just because "a customer turns out to be crooked." *Doe v. GTE Corp.*, 347 F.3d 655, 659 (7th Cir. 2003). "Just as a telephone company is not liable as an aider and abettor for tapes or narcotics sold by phone, and the Postal Service is not liable for tapes sold (and delivered) by mail," *id.*, Salesforce's sale of business software to Backpage is not "participation" in a sex-trafficking venture.

G.G.'s experience was horrific, and it is understandable that Plaintiffs would look for a large company to sue instead of her individual traffickers (or Backpage, which Plaintiffs named as a defendant and then dropped from the case). But the law does not allow injured parties to seek damages from entities that were not in any way connected to or responsible for those injuries. The district court properly dismissed Plaintiffs' claim with prejudice, and this Court should affirm.

## II.   STATEMENT OF THE ISSUES

1.   Whether section 230 of the Communications Decency Act bars Plaintiffs' claim because it would treat Salesforce, a provider of an interactive computer service, as the speaker or publisher of content posted or transmitted online by a third party.

**2.**     Whether FOSTA's exemption to section 230 for civil claims "brought under [18 U.S.C.] section 1595 … if the conduct underlying the claim constitutes a violation of section 1591," 47 U.S.C. § 230(e)(5)(A), requires that the plaintiff plead and prove that the *civil defendant's* conduct violated section 1591.

**3.**     Whether Plaintiffs failed plausibly to allege that Salesforce knowingly benefitted from "participation in a venture" to traffic G.G.

### III.     JURISDICTIONAL STATEMENT

Plaintiffs' jurisdictional statement is complete and correct.  .

### IV.     STATEMENT OF THE CASE

#### A.     Plaintiffs' Allegations

Salesforce is a software company that offers an internet-based customer relationship management (CRM) platform that allows subscribers to input and manage their own customer data. SA9-12 ¶¶ 29-33, 39, 45.  Businesses and other entities, including governments, use this platform, to organize their customer data and communicate with customers through sales and marketing activities, among other functions.  SA8-11 ¶¶ 29-33, 39.  Salesforce counts as customers over

150,000 entities, one of which was Website Technologies, LLC, an affiliate of Backpage.com, LLC. SA8-10 ¶¶ 29, 37.

Backpage.com, LLC in turn operated a website, backpage.com, that was "an online marketplace for various goods and services." SA5 ¶ 16. Although Plaintiffs describe Backpage as a "sex trafficking operation" or a "sex trafficking business," OB6-9, the complaint's more specific allegations establish that Backpage was an online classified advertising website. SA5 ¶ 16. The classified ads posted on its platform covered various subject matters, including "Jobs," "Automotive," and among still others, "Adult." SA7 ¶ 24. Some of these "Adult" ads were ads for sex, as the complaint alleges, and some were for illegal sex. SA6 ¶ 22. The complaint suggests that *all* of the ads in Backpage's "Adult" ads forum were for illegal sex, including sex with trafficking victims, *e.g.*, SA6-7 ¶¶ 22-25—but as this Court recognized, although "the majority of the advertisements in Backpage's adult section are for sex," "a majority is not all, and not all advertisements for sex are advertisements for illegal sex." *Backpage.com, LLC v. Dart*, 807 F.3d 229, 234 (7th Cir. 2015). Plaintiffs' sole source for their allegation that "Backpage earned nearly all of its revenue from advertisements illegally selling sex, including sex

9

trafficking," OB4-5 (citing SA7 ¶ 23 n.15), actually states that most of Backpage's revenue was from "Adult" ads, a category that was not limited to illegal trafficking but included topics like "Adult Jobs; Body Rubs; Datelines; Domination; Female Escorts; Fetish; Male Escorts; Strippers; and Transsexual Escorts," as well as other "Adult" services. Decl. in Support of Arrest Warrant, *People v. Ferrer* (Cal. Super.) ("Decl.") at 11-12, cited at SA7 ¶ 23 n.15 and reproduced at Dist. Ct. Dkt. 42, Ex. F; *accord Dart*, 807 F.3d at 230, 234 (further noting that "adult jobs" include "jobs related to services offered in other adult categories, whether or not the jobs are sexual"). And it is no surprise that Backpage's revenue came largely from "Adult" ads because, as the First Circuit noted, those were the only ads for which it charged a fee. *Jane Doe No. 1 v. Backpage.com LLC*, 817 F.3d 12, 17 (1st Cir. 2016); *Dart*, 807 F.3d at 236; *see also* Decl. at 12.

By 2008, Backpage was enjoying success as on online classifieds site, as it experienced "explosive growth" after craigslist.com elected to "reduce[] sex ads on its platform." SA5 ¶ 16. Plaintiffs allege that, in 2013, to further this pattern of growth, a Backpage affiliate bought a subscription to Salesforce's cloud-based CRM software. SA10 ¶¶ 37-38.

Based on this software contract and Backpage's alleged use of the software to grow its customer base—including by organizing its customer data and using that data to send marketing materials to customers and potential customers—the complaint alleges that Salesforce was "the driving force that enabled Backpage to scale its operations and increase the trafficking conducted" on its website. SA11 ¶ 41.

Plaintiffs vaguely allege that Salesforce provided Backpage with "unique technological tools and instruments" and "personalized support" for those tools. SA11 ¶ 40. But the complaint nowhere specifies how the software and support were allegedly "unique" or "personalized" to Backpage, nor does it allege that Salesforce modified its software or services at all, much less with the specific goal of helping Backpage engage in or facilitate trafficking. *Id.* The complaint alleges no facts suggesting that Salesforce provided anything other than the same software that over 150,000 companies and other entities use to manage customer relationships and grow their customer base. *See, e.g.*, SA8-9 ¶ 31 ("Salesforce tools are designed and intended to enhance the efficiency and success of any business."); SA10-11 ¶ 39.

Although Plaintiffs broadly assert that Salesforce "knew that … it was advancing sex trafficking on Backpage," OB6, they admit that they can allege only that Salesforce "knew, (or at minimum, should have known)" that Backpage was involved in criminal trafficking. OB7. They allege, without supporting detail, that Salesforce "learned about Backpage's illegal trafficking operation" through meetings with "Backpage representatives." OB6. But they nowhere allege that Salesforce or its software had anything to do with the content posted on backpage.com or that Salesforce modified its software or services to tailor them to sex trafficking.

The complaint alleges that, when G.G. was a minor, she was "trafficked by advertisements on Backpage," SA20 ¶ 74; *see also* SA28-29 ¶ 112(a)-(c). G.G. ran away from home and was picked up by a trafficker who forced her into the commercial sex trade through alcohol, drugs, and other coercive means and posted classified ads for her on backpage.com. SA20 ¶¶ 75-76. After a search, G.G.'s mother found an ad for G.G. on the site's "Escort Page." SA20 ¶ 76. She asked Backpage to remove the ad, but "Backpage's only response" was to refer her to the National Center for Missing and Exploited Children. *Id.* Plaintiffs further allege that

Backpage hosted on its site the ads used for G.G.'s trafficking and specifically received fees for the ads featuring G.G.  SA20 ¶ 112(a)-(c).

Plaintiffs identify certain Backpage content policies as causing the proliferation of sex-trafficking ads on its website, including those that harmed G.G.  They allege that Backpage designed and implemented filtering and moderation systems that "sanitize[d]" ads to conceal their illegal nature (such as by removing words suggesting trafficking or sexual exploitation) as a way "to evade law enforcement attention." SA28-29 ¶ 112(d)-(e).  They also allege that Backpage "implement[ed] a corporate policy … that discouraged moderators and employees" from contacting authorities and advocacy groups, and "refus[ed] to pull down advertisements" that were reported as exploiting and trafficking individuals for sex.  SA28-29 ¶ 112(g)-(i).

None of these detailed allegations about Backpage's conduct involves Salesforce's software or Salesforce itself.  Plaintiffs allege that G.G. was trafficked "by and through" Backpage, SA21 ¶ 78, but nowhere claim that Salesforce or its software played any role in developing or implementing Backpage's content policies or the classified ads on

backpage.com.  In fact, Plaintiffs' complaint and opening brief distance Salesforce's software from G.G.'s trafficking.

The complaint alleges that the CRM software was for "internal Backpage use only," SA11 ¶ 43, and had no connection to the classified ads for G.G. or any of the policies or practices that allegedly permitted traffickers to post those ads, SA28-29 ¶ 112.  Plaintiffs emphasize that Salesforce did not "screen[], edit[], approve[], remove[] or … ma[k]e any decisions related to the third-party content on Backpage."   OB24.  Although the complaint uses vague language conflating Salesforce with its software—or conflating Backpage's use of the software with Salesforce itself—the specific allegations in paragraph 112 make clear that neither Salesforce nor its software had anything to do with G.G.'s trafficking.

## B.    The District Court's Orders

Plaintiffs sued Salesforce, alleging that it violated federal anti-trafficking laws, as well as Illinois law, because it allegedly benefited from participating in a venture "involving" advertisements for sex trafficking.  Dist. Ct. Dkt. 1 ¶ 47.  Plaintiffs then filed two amended complaints.  Dist. Ct. Dkt. 25, 39.  After briefing on Salesforce's motion to dismiss the second amended complaint, Dist. Ct. Dkt. 40, and after the

district court indicated that a ruling would be issuing shortly, Sept. 9, 2021 Tr.4:4-8, Plaintiffs asked the court to delay its ruling so that they could amend the complaint again. *Id.* at 8:11-25, 9:1-9. Plaintiffs' third amended complaint added Backpage as a defendant (though Plaintiffs later voluntarily dismissed Backpage, Dist. Ct. Dkt. 100) and dropped the state-law claims—leaving only the claim under the federal trafficking statute. SA21-26 ¶¶ 80-95. Salesforce moved to dismiss the complaint under section 230 or, in the alternative, for failure to state a claim. Dist. Ct. Dkt. 63. After a hearing, the district court dismissed the complaint with prejudice. A35.

The court first held that Plaintiffs' claim "is a quintessential claim covered by § 230" because "it seeks to impose liability on an interactive computer service for third-party content that was published on an online platform." A15. Applying the "plain language of the statutory definition," the court found that Salesforce "plainly qualifies" as an interactive computer service. A8. The court also concluded that Plaintiffs' claim would treat Salesforce as the speaker of third-party content because (1) it "relate[s] to Backpage's use of the CRM software to engage in online marketing communications" and "§ 230 bars imposing

15

liability on a provider of messaging or e-mail services for content and activities conducted via those services," A14; and (2) it is "predicated on the notion that Salesforce should be held responsible for" the classified ads for G.G. that her traffickers posted, A15-17.

The district court also held that none of the exemptions to section 230 applied, including the FOSTA amendment exempting "claim[s] in a civil action brought under" 18 U.S.C. § 1595 "if the conduct underlying the claim constitutes a violation of [18 U.S.C. §] 1591." 47 U.S.C. § 230(e)(5)(A). The court, endorsing the analysis of other district courts across the country, explained that "the 'most straightforward reading' of th[e] provision requires an exemption only 'if the civil defendant's conduct amounts to a violation of section 1591.'" A19. This reading, the court noted, was confirmed by the neighboring exemptions and enactment history. A20-23. The court concluded that "§ 230 precludes Plaintiffs' claim[] against Salesforce" because Plaintiffs "do not dispute" that they cannot "allege Salesforce engaged in conduct that would violate § 1591." A23-24.

The district court also held that, even if Plaintiffs' claim were not barred under section 230, it would fail to state a claim under section 1595.

A24. Plaintiffs "failed to allege plausibly that Salesforce knew, or should have known, about G.G.'s specific trafficking or any of the advertisements trafficking her on Backpage." A31. As to participation, Salesforce "did not take part in the construction of" Backpage's business, and the complaint nowhere alleged that Salesforce "altered its software to better facilitate sex trafficking." A32-34. That Salesforce's software was "customizable" by the customer does not mean Salesforce itself "actually customized the software to meet Backpage's needs." A34. And Plaintiffs' allegations about the provision of "technical support" and sale of a "duplicate copy" of the software license for use overseas failed to establish culpability on Salesforce's part, much less with respect to the admittedly domestic trafficking of G.G. A34. The court dismissed Plaintiffs' claim with prejudice because the complaint "establish[ed] that Salesforce is entitled to dismissal" under section 230. A34-35.

Plaintiffs filed a Rule 59(e) motion to alter or amend the judgment, claiming manifest errors in the district court's application of FOSTA and section 1595. Dist. Ct. Dkt. 108. The court rejected this attempt to "relitigate losing arguments" resolved in the earlier ruling. Dist. Ct. Dkt. 114 at 2.

## V.   SUMMARY OF ARGUMENT

**A.**   The district court correctly dismissed Plaintiffs' federal trafficking claim as barred by section 230.  *Chicago Lawyers' Comm. for Civ. Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008).  None of the exemptions to section 230 applies, and Plaintiffs (for good reason) have not even tried to plead the only possible exemption that could apply—namely, that Salesforce is guilty of criminal sex trafficking.

**1.**   Plaintiffs' claim would treat Salesforce as the publisher or speaker of classified ads allegedly posted for G.G. by third parties.  That places the claim squarely within section 230's express scope.  Plaintiffs try to read into the statute two requirements found nowhere in the text—that the defendant must have "t[aken] action or made decisions with respect to online content," and that the defendant's software must have interacted with the at-issue content.  Both arguments ignore the broad text of section 230(c)(1), which prohibits treating an interactive computer service provider as the publisher or speaker of "any information" posted online by a third party.  And as the district court found, even under Plaintiffs' reading, section 230 still would bar their claim because it

18

would hold Salesforce liable for the alleged misuse of its interactive online software by another entity (Backpage) to organize customer data and create and send marketing communications to alleged trafficking customers—a straightforward application of section 230 even under Plaintiffs' atextual reading.

2.     Equally without merit is Plaintiffs' argument that their claim is exempt from section 230.  As the Ninth Circuit recently held, FOSTA's exemption requires a plaintiff to allege that *the civil defendant's* conduct amounted to a criminal violation of section 1591—not merely that a third party's conduct did.  *Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137 (9th Cir. 2022).

a.     FOSTA's plain text compels the district court's reading.  The exemption applies to "any claim in a civil action brought under section 1595" only if the "conduct underlying the claim" violates section 1591.  47 U.S.C. § 230(e)(5)(A).  Given that the "conduct" in question must be the conduct "underlying" the "claim in a civil action," it must be conduct committed by the civil defendant, not some third-party perpetrator.  And the exemption requires that the referenced conduct have "constituted a violation" of section 1591, confirming that the plaintiff must show that

the challenged "conduct" (*i.e.*, the conduct of the defendant in the "civil action") constituted a violation of the criminal provision, as opposed to just referring to the nature of the plaintiff's injury (sex trafficking, versus some other claimed wrong) at the hands of someone else.

**b.**     The district court's reading also comports with the undisputed meaning of nearby exemptions using substantively identical language, *see* 47 U.S.C. § 230(e)(5)(B)-(C), and with FOSTA's "'place in the overall statutory scheme,'" *Parker Drilling Mgmt. Servs., Ltd. v. Newton*, 139 S. Ct. 1881, 1888 (2019).

**c.**     FOSTA's enactment history confirms the district court's reading.  As introduced, FOSTA would have exempted *all* section 1595 sex-trafficking claims.  But when that proposal drew strong opposition, Congress amended the bill to exempt section 1595 claims only where the interactive computer service provider defendant itself committed criminal sex trafficking in violation of section 1591.  Plaintiffs' contrary view would improperly elevate unenacted text that Congress rejected over the actual text it chose.

**B.**     The district court correctly held that, even if Plaintiffs' claim were not barred by section 230, they did not plausibly allege facts

20

sufficient to support a claim against Salesforce under section 1595, the civil sex-trafficking provision.

1.     Plaintiffs do not and cannot allege that Salesforce's sale of the software Backpage allegedly used to grow its business amounts to "participation in a venture" devoted to sex trafficking, much less a venture devoted specifically to G.G.'s trafficking.   18 U.S.C. § 1595. Section 1595 demands indications of a "common undertaking or enterprise involving risk and potential profit" between the defendant and alleged traffickers—far beyond anything Plaintiffs have alleged here. *Doe #1 v. Red Roof Inns, Inc.*, 21 F.4th 714, 724-27 (11th Cir. 2021).

2.     Plaintiffs also do not contend that Salesforce knew or should have known about G.G.'s trafficking, as required to support a claim for "participation in a venture" under section 1595.  Section 1595 requires "an act" in violation of section 1591, which in turn requires knowledge that "the person" being trafficked would be caused to engage in a commercial sex act while underage.

C.     Finally, Plaintiffs fail to plead that Salesforce knowingly received a benefit from the venture that trafficked G.G., as section 1595 requires.  They allege only that Salesforce received financial benefits

from its contracts with Backpage generally—not that it profited from G.G.'s trafficking or any related advertisements.

## VI.   STANDARD OF REVIEW

This Court reviews de novo a district court ruling granting a Rule 12(b)(6) motion.  *See Proft v. Raoul*, 944 F.3d 686, 690 (7th Cir. 2019). "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Although '[courts] accept the well-pleaded facts in the complaint as true, legal conclusions and conclusory allegations … are not entitled to this presumption of truth.'"  *Dix v. Edelman Fin. Servs., LLC.*, 978 F.3d 507, 513 (7th Cir. 2020).

## VII.   ARGUMENT

### A.   The District Court Correctly Held That Section 230 Bars Plaintiffs' Claim Against Salesforce

Section 230 precludes treating "an online information system … 'as the publisher or speaker of any information provided by' someone else." *Chicago Lawyers' Comm. for Civ. Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666, 671 (7th Cir. 2008).  The district court correctly held that section 230 bars Plaintiffs' section 1595 claim because (1) it would

treat an interactive computer service provider (Salesforce) as the publisher or speaker of content created by third parties (the classified ads for G.G. posted on backpage.com) by holding Salesforce liable for the harmful effects of those ads, and (2) it would hold Salesforce liable for Backpage's alleged use of the CRM software to build a customer database and use of that database and Salesforce's tools to email marketing materials to customers and prospects, again attributing to Salesforce the harmful effects of content transmitted by others.  A16-27.

Plaintiffs offer no way around section 230's clear application here. Their argument that Salesforce is not a provider of an "interactive computer service" under section 230 ignores the statute's plain language in favor of atextual requirements invented from whole cloth.  And their argument that FOSTA exempts their civil sex-trafficking claim from section 230 also fails because, as the Ninth Circuit and a supermajority of district courts have held, that exemption applies only if the plaintiff plausibly alleges that the civil defendant's conduct amounted to a *criminal* sex-trafficking violation (a showing that Plaintiffs have not even tried to make).

23

### 1. Plaintiffs' Claim Would Treat Salesforce as the Publisher or Speaker of Third-Party Content

The core thrust of section 230 is that providers of interactive computer services cannot be held liable for harm caused by content posted online by "someone else." *Craigslist*, 519 F.3d at 671. Plaintiffs' claim fits that mold in two ways. First, they say G.G. was harmed because of the classified ads that her third-party trafficker posted on backpage.com. That means Salesforce, which provided the corporate affiliate of Backpage, the website's operator, with software, would be held liable for content that others posted. Second, they say minors were injured because *Backpage* used Salesforce's software tools to house its customer data online and to market to actual and potential customers, including traffickers—again meaning Salesforce would be liable for another's online content.

Plaintiffs offer several arguments in response, but none has merit. They first contend that section 230 should be limited to defamation or claims where publication is an element. OB22-23. But nothing in section 230 limits its scope to such claims, and this Court has already rejected attempts to read such atextual limitations into the statute. In *Craigslist*, 519 F.3d at 671, the plaintiffs claimed that discriminatory online housing

advertisements violated the Fair Housing Act and argued that section 230 should not apply because there was no indication Congress meant the statute to extend to such claims. This Court disagreed, noting that "[s]ection 230(c)(1) is general" and that, although the motivation for its passage may have been narrower, "a law's scope often differs from its genesis." *Id*. Section 230 barred the claims, even though they did not involve defamation or publication-related claims, because they treated Craigslist as the publisher or speaker of the discriminatory ads authored by "someone else." *Id*.

This Court's refusal to limit section 230 to defamation and publication-related claims aligns with decisions from other circuits. In *Barnes v. Yahoo!, Inc.*, for example, the Ninth Circuit declined to limit section 230 to defamation because "the statute does not mention defamation." 570 F.3d 1096, 1104 (9th Cir. 2009). Likewise, the Second Circuit declined to limit section 230 to claims where "publication is … an explicit element." *Force v. Facebook*, 934 F.3d 53, 64 n.18 (2d Cir. 2019) (citing cases applying section 230 to variety of claims).

Consistent with these rulings, courts have applied section 230 to bar claims against providers of interactive computer services for claims

of sex trafficking and sexual exploitation.  In *Day v. TikTok, Inc.*, the district court applied *Craigslist* to claims alleging that an online video platform should have removed videos of her daughter depicting child abuse and sexual exploitation, stating that the defendant "cannot be held liable by the terms of Section 230(c)(1)" for the harm caused by content created by a third party.  2022 WL 595745, at *2 (N.D. Ill. Feb. 28, 2022).  And in *J.B. v. G6 Hospitality, LLC*, the court held that section 230 barred claims under section 1595 for alleged facilitation of the plaintiff's sex trafficking.  2021 WL 4079207, at *4 (N.D. Cal. Sept. 8, 2021), *appeal pending*, No. 22-15290 (9th Cir. 2022).  Other courts have done the same.  *E.g.*, *M.H. v. Omegle.com, LLC*, 2022 WL 93575, at *6 (M.D. Fla. Jan. 10, 2022), *appeal pending*, No. 22-10338 (11th Cir. 2022); *Doe v. Kik Interactive, Inc.*, 482 F. Supp. 3d 1242, 1251 (S.D. Fla. 2020).

As these and other courts have recognized, section 230 applies when a plaintiff treats "an online information system … 'as the publisher or information provided by' someone else." *Craigslist*, 519 F.3d at 671.  The question is not "whether the plaintiff's complaint calls the defendant a publisher or speaker," but "whether the cause of action inherently requires the court to treat the defendant as the 'publisher or speaker' of

content provided by another." *Daniel v. Armslist, LLC*, 926 N.W.2d 710, 723-24 (Wis. 2019); A13. Artful pleading cannot avoid section 230 when the allegations are "merely another way of claiming that [the defendant] was liable for publishing the communications" that led to the victim's harm. *Doe v. MySpace, Inc.*, 528 F.3d 413, 420 (5th Cir. 2008). Rather, section 230 "is implicated not only by claims that explicitly point to third party content but also by claims which, though artfully pleaded to avoid direct reference, implicitly require recourse to that content to establish liability or implicate a defendant's role, broadly defined, in publishing or excluding third party [c]ommunications." *Cohen v. Facebook, Inc.*, 252 F. Supp. 3d 140, 156 (E.D.N.Y. 2017), *aff'd in relevant part*, *Force*, 934 F.3d at 68.

Here, Plaintiffs' claim treats Salesforce as a publisher or speaker because it would hold Salesforce liable for the harmful effects of classified ads for G.G. that were posted on backpage.com by a third party. The complaint makes clear that G.G.'s harm arises from "advertisements on Backpage in 2016" and that "[Backpage] [p]rovid[ed], assist[ed], support[ed], and facilitate[d] a forum for [G.G.'s] trafficker to post her for trafficking." *See, e.g.*, SA20 ¶ 74; SA28 ¶ 112(a). As the district court

explained, Plaintiffs' claim "seek[s] to hold Salesforce liable for the fact that Backpage used Salesforce software to cultivate traffickers as customers and grow the website's reach among sex traffickers, ultimately resulting in the posting of the advertisement of G.G." A15. The claim thus "seeks to impose liability on an interactive computer service for third-party content that was published on an online platform." *Id.* The California Court of Appeal reached the same conclusion in addressing nearly identical allegations against Salesforce, reasoning that the plaintiffs sought to "hold Salesforce responsible as a publisher of information in ads that Backpage customers posted on Backpage." *Does #1-50 v. Salesforce.com, Inc.*, 2021 WL 6143093, at *8 (Cal. Ct. App. Dec. 30, 2021) (not designated for publication).

Plaintiffs' claim also would treat Salesforce as the publisher or speaker of the customer data and marketing communications that Backpage stored or transmitted online using Salesforce's software. As the district court reasoned, "Plaintiffs suggest that Salesforce should have monitored Backpage's use of Salesforce's tools and deleted or restricted access to its software in response to illegal activity—in other words that Salesforce acted as [a] publisher regarding Backpage's

28

content on Salesforce's own applications." A14. Because Plaintiffs' claim "relate[s] to Backpage's use of Salesforce's CRM software to engage in online marketing communications with sex traffickers to expand Backpage's customer base," the claim "treat[s] … Salesforce as a publisher." *Id.* None of Plaintiffs' contrary arguments has merit.

Plaintiffs first cite *Doe v. Internet Brands, Inc.*, 824 F.3d 846, 853 (9th Cir. 2016), for the proposition that section 230 "does not provide a general immunity against all claims derived from third-party content." OB28. That has never been Salesforce's position, nor is it what the district court held. In *Internet Brands, Inc.*, the plaintiff alleged that a modeling networking website failed to warn users that predators might browse model profiles and lure victims into dangerous situations offline. 824 F.3d at 848. Because there was no allegation that the predators posted anything to the defendant's website or that plaintiff was lured by any posting the defendant failed to remove, the Ninth Circuit held that the claim "would not require Internet Brands to remove any user content or otherwise affect how it publishes or monitors such content." *Id*. at 851. By contrast, Plaintiffs' claim against Salesforce relies directly on third-party content—the advertisements for G.G. and Backpage's use of

Salesforce's software to store and transmit its own content—and these are the only links that could even remotely connect Salesforce with the harm alleged by G.G. As the district court explained, Plaintiffs' claim is "predicated on the notion that Salesforce should be held responsible for the existence of third-party content," including the G.G. ads and Backpage's own content—"that is, they treat Salesforce as a publisher." A16-17.

Plaintiffs next try to read into section 230 various novel limitations with no support in text or precedent. They argue that Salesforce can be treated as a publisher or speaker of the advertisements that trafficked G.G. only if it "took action or made decisions with respect to third-party content." OB23. But the statute simply states that an interactive computer service cannot be "treated as a publisher or speaker" of third-party content, 47 U.S.C. § 230(c)(1). Nothing in the text requires the provider to have hosted that content or taken any action with respect to it. On the contrary, as discussed more fully below, the definitions of "interactive computer service" make plain that the provider need not have hosted or interacted with the at-issue content.

Plaintiffs cite the Texas Supreme Court's decision in *In re Facebook, Inc.*, 625 S.W. 3d 80, 96-101 (Tex. 2021), but it actually confirms why section 230 applies. The Texas court held that section 230 did not apply to allegations that Facebook engaged in affirmative acts of encouraging trafficking on its platform because it created a platform for traffickers to meet and entrap potential victims and used its data to facilitate such connections. *Id*. at 97-98. Although Plaintiffs try to analogize these actions to Salesforce's conduct, "the actions [p]laintiffs allege Salesforce took to assist and support Backpage in its sex trafficking venture are, in actuality, actions that Backpage took using Salesforce's … software." A32. The allegations that Salesforce "made it possible *for Backpage*" to engage in online sex trafficking and that Salesforce's CRM was used "*by Backpage*" to "help *Backpage* manage and track the effectiveness of *Backpage's* marketing efforts," SA11 ¶ 40; SA23 ¶ 87(a)-(c) (emphases added), at most show that Salesforce engaged in "passive acquiescence in trafficking conducted by others"—a conclusion that cannot establish that

Salesforce engaged in an "affirmative act" taking it outside section 230. *In re Facebook*, 625 S.W. 3d at 96.[1]

Finally, Plaintiffs argue that the district court improperly relied on the First Circuit's decision in *Jane Doe No. 1 v. Backpage.com, LLC*, 817 F.3d 12 (1st Cir. 2016), OB27, but that also is incorrect. Even assuming that court incorrectly applied section 230 to allegations that *Backpage* knowingly used content moderation policies to facilitate trafficking, FOSTA has since clarified which sex-trafficking claims are exempted from section 230: those where the civil defendant's underlying conduct constitutes criminal sex trafficking in violation of section 1591. As discussed below, that exemption does not apply here because Plaintiffs do not and cannot allege that Salesforce itself violated section 1591.

## 2. Salesforce Is a Provider of an "Interactive Computer Service"

Contrary to Plaintiffs' contention, the district court also correctly applied the clear language of section 230 to hold that Salesforce "plainly qualifies" as an "interactive computer service." A8. Under section 230,

---

[1] Although Salesforce believes that the Texas Supreme Court's treatment of section 230 as it applies to state-law claims is erroneous in certain respects, that issue is not presented here because Plaintiffs assert only federal claims.

32

an "interactive computer service" is "any information service, system, or access software provider that provides or enables computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). An "[a]ccess software provider" means "a provider of software (including client or server software) or enabling tools … that do[es] any one or more of the following":

    (A)  filter, screen, allow, or disallow content;

    (B)  pick, choose, analyze, or digest content, or

    (C)  transmit, receive, display, forward, cache, search, subset, organize, reorganize, or translate content.

*Id*. § 230(f)(4). Plaintiffs' allegations, read against this straightforward text, confirm that Salesforce is a provider of an "interactive computer service."

Congress used broad language in defining the relevant terms. To qualify as an access software provider, the software must merely act on "content," 47 U.S.C. § 230(f)(4)—there is no requirement, as Plaintiffs contend, that the "content" referenced in the definition also be the "information" underlying a plaintiff's claim. OB30. As the district court explained, "the text of § 230 imposes no such requirement—an

interactive computer service must simply permit users to interact with content, without any reference to *what* content." A11-12. And section 230(c)(1) covers "any information" provided by another information content provider—not just information that might have been displayed or hosted by the defendant's platform. "[E]xpansive terms" such as "information," "modified by the comprehensive 'any'" indicate that Congress intended a law to "be given wide scope." *Bilski v. Kappos*, 561 U.S. 593, 601 (2010). And reading the term "information" to have the same scope as "content" would defy the canon that courts "presume that the use of different words in the same statute is evidence that Congress intended different meanings." *United States v. Melvin*, 948 F.3d 848, 852 (7th Cir. 2020).

Courts have correctly used these textual cues to construe "broadly" the definition of an "interactive computer service"—including for providers of business software like Salesforce's. *Stayart v. Yahoo!, Inc.*, 651 F. Supp. 2d 873, 884 (E.D. Wis. 2009), *aff'd*, 623 F.3d 436 (7th Cir. 2010). In *Zango, Inc. v. Kaspersky Lab, Inc.*, 568 F.3d 1169, 1175-76 (9th Cir. 2009), for example, the Ninth Circuit held that section 230 barred claims against a provider of antivirus software; and in *GoDaddy.com,*

34

*LLC v. Toups*, 429 S.W.3d 752, 758-59 (Tex. App. Apr. 10, 2014), a Texas appellate court held that section 230 barred claims against a website hosting service for content posted on the website of one of its customers. *See also PatentWizard, Inc. v. Kinko's, Inc.*, 163 F. Supp. 2d 1069, 1070-71 (D.S.D. 2001) (defendant provided computer and internet access to customer); *Davis v. Motiva Enters., LLC*, 2015 WL 1535694, at *2, *4 (Tex. App. Apr. 2, 2015) (defendant provided computer and internet access to employee); *Smith v. Trusted Universal Standards in Elec. Transactions, Inc.*, 2011 WL 900096, at *6-7 (D.N.J. Mar. 15, 2011) (defendant provided software for filtering spam).  In short, Congress used broad definitional language, so courts construe the statute broadly, including to cover providers of software used in connection with websites or online communications.

Salesforce is an "access software provider" because it provided internet-based "access to a coordinated set of applications" that allowed Backpage, via cloud-based software, to store, filter, analyze, and organize its customer data within the meaning of section 230(f)(4).  SA8-9, 23 ¶¶ 29-33, 87.  And Salesforce "enables computer access by multiple users" (*i.e.*, Salesforce's customers and their employees) "to a computer server"

35

(*i.e.*, servers on which Salesforce's software is hosted) within the meaning of section 230(f)(2). *Id.* This is the exact conclusion reached by the California Court of Appeal after examining the text of the statute and nearly identical allegations. *Does #1-50*, 2021 WL 6143093, at \*6.

The district court properly rejected Plaintiffs' attempt to rewrite the text of section 230 to cover only providers that host publicly accessible platforms, as opposed to situations where information is "stored privately." OB31. As the district court explained, "nothing in either the statutory text or case law supports this view." A10. Other courts agree. In *Fields v. Twitter, Inc.*, the court held that section 230(c)(1) covers the transmission of communications, whether public or private. 217 F. Supp. 3d 1116, 1128 (N.D. Cal. 2016) (citing cases), *aff'd on other grounds*, 881 F.3d 739 (9th Cir. 2018). And in *Beyond Systems, Inc. v. Keynetics, Inc.*, the court held that section 230 protected interactive computer service providers from liability for transmitting large numbers of personal spam emails. 422 F. Supp. 2d 523, 536-37 (D. Md. 2006).

Plaintiffs suggest that if Salesforce is an interactive computer service provider, so is any software creator. OB32. But that is incorrect—section 230 applies to software that "provides or enables

36

computer access by multiple users to a computer server." 47 U.S.C. § 230(f)(2). Not all software companies enable such access, but for software companies that do, Congress determined that they should not be treated as the publisher or speaker of information created by a third party. That was the holding of *Zango*, where the Ninth Circuit held that the defendant was an interactive computer service because "under the literal provisions of § 230(f)(2), [the defendant] 'provides or enables access by multiple users to a computer server' by providing its customers with online access to its update servers." 568 F.3d at 1175.

Finally, even if Plaintiffs were correct that section 230 applies only to content posted online through an access software provider's software, that requirement would be met here, because Backpage's *own* use of the Salesforce's CRM software is at the heart of Plaintiffs' claim. Plaintiffs' liability theory depends on their allegation that Salesforce's technology allowed users *at Backpage* to analyze and organize information about sex traffickers and transmit marketing messages to a customer base that included traffickers. SA8-13, 27 ¶¶ 29-33, 37-51, 87(a)-(h). As the district court held, those allegations establish that Salesforce acted as an interactive computer service provider, as its software provided "multiple

users" at Backpage with access to "a set of enabling tools that allow those users to analyze, organize, arrange, transmit, and display content provided by a third-party (here, Backpage)." A10.

### 3. Courts Have Resoundingly Rejected Plaintiffs' Reading of FOSTA's Exemption

Plaintiffs next advance an expansive and incorrect reading of FOSTA's narrow exemption for certain sex-trafficking claims, in an effort to cast their claim as exempt from section 230. But as courts across the country, including most recently the Ninth Circuit, have held, Plaintiffs' reading of that exemption is wrong:  the exemption applies only where an interactive computer service provider *itself* engages in conduct that violates 18 U.S.C. § 1591, the criminal sex-trafficking statute. Because Plaintiffs do not and cannot allege that Salesforce engaged in such conduct, the exemption does not apply.

### a. Section 230's Text and Structure Confirm That the FOSTA Exemption Applies Only Where the Defendant Violated the Criminal Sex Trafficking Statute

Questions of statutory interpretation must "begin[] where all such inquiries must begin:  with the language of the statute itself." *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989). Here the text

is clear:  "[S]ection 230(e)(5)(A) removes section 230 immunity only when a [defendant] violates 18 U.S.C. § 1591."  *Does 1-6 v. Reddit, Inc.*, 51 F.4th 1137, 1143 (9th Cir. 2022).

FOSTA's exemption applies to "any *claim in a civil action* brought under section 1595 … if the conduct *underlying the claim* constitutes a violation of section 1591."  47 U.S.C. § 230(e)(5)(A) (emphases added). The most natural reading of the statute is that the conduct underlying the plaintiff's civil claim—that is, the defendant's own conduct—must violate the criminal sex-trafficking statute, section 1591.  By using the words "any claim" and "underlying the claim" in close succession, Congress expressly linked the "claim in a civil action" to which the exemption may apply (a "claim" under section 1595) to the condition that determines whether it applies (that the conduct underlying "the claim" violate section 1591).  The district court applied the "'normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning'" and found that the "'claim in a civil action' and the 'claim' which the conduct must underlie are the same."  A19 (citing *C.I.R. v. Lundy*, 516 U.S. 235, 250 (1996)).

This reading is confirmed by the statutory text requiring that the conduct "underlying" the civil claim be the conduct that violates the criminal law. The Ninth Circuit emphasized that point in *Reddit*, looking to the Supreme Court's interpretation of "analogous language in a similar context." 51 F.4th at 1142. Specifically, in *OBB Personenverkehr AG v. Sachs*, 577 U.S. 27 (2015), the Court examined an exception to the Foreign Sovereign Immunities Act ("FSIA"), for any action "based upon a commercial activity carried on in the United States." *Id.* at 33. S*achs* held that that statutory language required courts to "look[ ] to the 'basis' or 'foundation' for [the] claim"—meaning what, "if proven, would entitle a plaintiff to relief." *Id.* (cleaned up).

As the Ninth Circuit explained in *Reddit*, *Sachs* is "instructive" because "'underlying' and 'based on' are analogous." "Underlying" means "to be at the basis of" or "form the foundation of." *United States v. McClure*, 854 F.3d 789, 793 (5th Cir. 2017); *see also Underlie*, American Heritage Dictionary (5th ed. 2016) ("[t]o be the support or basis of"); *Underlie*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/underlie ("to be at the basis of: form the foundation of"). So just as the conduct that a suit is "based on" is that

which the plaintiff must prove about the defendant in order to prevail, so too the conduct "underlying" a civil sex-trafficking claim is what the plaintiff has to prove in order to win—and that can only mean *the civil defendant's conduct*, because a plaintiff who comes to court with no evidence about the civil defendant and only evidence about a third-party trafficker's wrongdoing will lose.

Applying this logic, the Ninth Circuit reasoned that the defendant's "own conduct must 'underlie' the claim for purposes of" the FOSTA exemption, and therefore the defendant's "own conduct must violate 18 U.S.C. § 1591 for the … exception to apply." *Reddit*, 51 F.4th at 1143. Plaintiffs' reading would rewrite "underlying" to mean that the conduct in question must relate *in some way*—even indirectly—to a violation of section 1591. OB34. But this is not what "underlying" means, and Plaintiffs cite no support for this interpretation. *Reddit*, 51 F.4th at 1142-43.

Plaintiffs try to minimize *Sachs* by arguing that FOSTA and the FSIA are different statutes with immunity provisions that work differently. OB41-42. That distinction is immaterial, as the relevant question under both statutes is *what* conduct underlies a claim such that

41

the exemption applies. *Sachs* explains how to determine when a claim is "based on" certain conduct and thus also when conduct "underlies" a claim (given that the terms are synonymous). The conduct that "'underl[ies]' a claim [is that which is] most important to proving the claim," and that is the named defendant's "own conduct." *Reddit*, 51 F.4th at 1142.

Plaintiffs' argument that the district court's reading of the exemption improperly adds the word "defendant," OB37, is wrong. The "plain text of FOSTA" *itself* "establishes that a[n interactive computer service] can only be held liable if its own conduct—not a third party's—violates 18 U.S.C. § 1591." *Reddit*, 51 F.4th at 1141. The only parties whose argument requires changing the statutory text are *Plaintiffs*, whose reading effectively erases the phrase "if the conduct underlying the claim constitutes a violation of section 1591."

Plaintiffs next assert that the reference to section 1591 merely clarifies that the underlying violation must be of section 1591, as opposed to other criminal provisions of the same chapter. OB36-37. But that reading has no textual support, and the "wider statutory context confirms" that the exemption requires the defendant itself to have

violated 18 U.S.C. § 1591. *Reddit*, 51 F.4th at 1143; *see also* A20. The two exemptions below section 230(e)(5)(A), enacted at the same time, use nearly identical language to allow states to prosecute "any charge in a criminal prosecution" against an interactive computer service provider, if the "conduct underlying the charge" would violate section 1591 or another federal criminal anti-trafficking statute. 47 U.S.C. § 230(e)(5)(B)-(C). The construct "*any charge* in a criminal prosecution" and "conduct *underlying the charge*" in both subsections is functionally identical to the "any claim in a civil action" and "conduct underlying the claim" construct of section 230(e)(5)(A).

As the Ninth Circuit concluded, this language meant that "Congress did not intend to dispense with a conventional mens rea element, which would require that the defendant know the facts that make his conduct illegal." *Reddit*, 51 F.4th at 1143 (internal quotation omitted); *see also Staples v. United States*, 511 U.S. 600, 605 (1994). Rather, subsections (B) and (C) permit state prosecutions only when the defendant either "'knowingly' facilitated trafficking" or "'intended' to" promote or facilitate prostitution. 51 F.4th at 1143 (bracket omitted); *see also* A20. Reading the substantively identical language in subsections

43

(B) and (C) in the way Plaintiffs read subsection (A) would produce a dramatic result where states could criminally prosecute defendants when *someone else* committed a criminal violation.

Plaintiffs also try to defend their interpretation by pointing to a provision in section 1595 allowing states to sue "any person who violates section 1591." OB39 (citing 18 U.S.C. § 1595(d)). But the difference in language Plaintiffs highlight cannot bear the weight they ascribe to it. Section 1595(d), in allowing *parens patriae* suits, had to specify whom states could sue, and it did so using the word "person." FOSTA, conversely, enacted an exception to immunity, and described the scope of that exception through the type of "claim" it would cover. 47 U.S.C. § 230(e)(5)(A). Congress's use of different words in different contexts provides no basis to distort the plain text of the provision involved here.

As the district court held, "the text, by both its plain terms and statutory structure, is clear that the FOSTA exemption applies only where the civil defendant's actions violated § 1591." A21. The district court's conclusion matches that of "a conspicuous majority" of district courts around the country. *L.H. v. Marriott Int'l, Inc.*, 2022 WL 1619637,

44

at *11 (S.D. Fla. May 23, 2022).[2]    And now, the Ninth Circuit has embraced that conclusion as well.  *Reddit*, 51 F.4th at 1142-43.

### b. FOSTA's Enactment History Confirms that Plaintiffs' Reading of the Exemption Is Incorrect

The district court also correctly found, consistent with other courts, that FOSTA's enactment history confirms the plain-text reading of the statute outlined above—and specifically that "the FOSTA exemption was not meant to encompass fully every possible claim under § 1595."  A22; *accord Reddit*, 51 F.4th at 1143-44.

As enacted in 1996, section 230 aimed to "preserve the vibrant and competitive free market" created by the internet and to "promote [its] continued development."  Telecommunications Act of 1996, Pub. L. No. 104-104, § 509, 110 Stat. 56, 138 (codified at 47 U.S.C. § 230(b)).  Even before FOSTA was passed in 2018, section 230 did not protect interactive computer services from federal criminal prosecution.  S*ee* 47 U.S.C. § 230(e)(1) (2017).  But before FOSTA it was unclear whether section 230

---

[2] *A.M. v. Omegle.com, LLC*, 2022 WL 2713721, at *6 (D. Or. July 13, 2022); *J.B.*, 2021 WL 4079207, at *12; *M.L. v. Craigslist, Inc.*, 2020 WL 5494903, at *4 (W.D. Wash. Sept. 11, 2020); *Kik Interactive, Inc.*, 482 F. Supp. 3d at 1250-51.

covered *civil* suits where the defendant itself allegedly engaged in criminal sex trafficking. *Reddit*, 51 F.4th at 1144; *Doe*, 817 F.3d at 23.

FOSTA was introduced to address that issue and to "eliminate section 230 as a defense for websites that knowingly facilitate sex trafficking." S. Rep. No. 115-199, at 2 (2018); *accord Reddit*, 51 F.4th at 1144. Notably, the original bill that became FOSTA would have exempted ***all*** sex-trafficking claims under section 1595. The original versions of FOSTA introduced in the House and Senate stated that section 230 would not "limit the application of section 1595." H.R. 1865, 115th Cong. § 3 (Apr. 3, 2017); S. 1693, 115th Cong. § 3 (Aug. 1, 2017); *see Reddit*, 51 F.4th at 1144.

This version of the bill produced strong opposition, including warnings that imposing a negligence standard for trafficking content would require internet companies to monitor everything on their sites "to find every impermissible promotion," thus forcing "the entire Internet" to "comprehensively review all the content they receive." *The Stop Enabling Sex Traffickers Act of 2017:  Hearing on S. 1693 Before the S. Comm. on Com., Sci. & Transp.*, 115th Cong. 19 (2017) (statement of E. Goldman); *accord id*. at 35 (statement of A. Slater, General Counsel,

Internet Association).   To prevent that result, California's Attorney General and others suggested the bills be amended to require "a clear sense of knowing," so that "those who are truly trying to grow and innovate based on that protection they get from lawsuits" would remain under section 230's protection.  *Id.* at 53 (statement of X. Becerra); *accord id.* at 31 (statement of A. Slater); *Reddit*, 51 F.4th at 1144.

The Senate amended the bill to address these concerns, adding the language in section 230(e)(5)(A) that the "conduct underlying the claim" must "constitute[] a violation of section 1591."  In effect, the amendment imported the criminal "knowingly" *mens rea* standard from section 1591. *Reddit*, 51 F.4th at 1144.  While the Senate considered the final version of the bill, multiple senators described the purpose of the bill as to target those who knowingly facilitate sex trafficking:

- "Why is this law so important? … [N]ow all the prosecutors in the country can go after anyone who *knowingly facilitates* sex trafficking online."  (Sen. Claire McCaskill);

- "Clearly, the websites that facilitate this, *knowingly encouraging and profiting from sex trafficking*, must face repercussions in the courtroom."  (Sen. Richard Blumenthal);

- "[FOSTA] would allow … the victims themselves to go after the websites that *knowingly provide a platform for sex trafficking*." (Sen. Bill Nelson); and

47

- "[FOSTA] would ensure that section 230 of the Communications Decency Act cannot be used as an excuse anymore for websites that *knowingly facilitate sex trafficking*." (Sen. Deb Fischer).

164 Cong. Rec. S1849-08 (daily ed. Mar. 21, 2018) (emphases added).

This amendment struck a balance. On one hand, Congress enacted section 230 to enable "the explosive growth of websites that facilitate user-generated content" and to encourage interactive services to moderate harmful content. S. Rep. No. 115-199, at 2. On the other, Congress did not want section 230 to protect bad-actor websites that knowingly use their platforms to facilitate sex trafficking. *Id.*

Some members of Congress viewed the amended version of the bill as too restrictive. The original House sponsor, Representative Ann Wagner, criticized the amendment for "narrow[ing]" the section 230 "carve-out" and imposing a higher, "'knowingly' *mens rea* standard." *The Latest Developments in Combating Online Sex Trafficking: Hearing Before the Subcomm. on Commc'ns & Tech. of the H. Comm. on Energy & Com.*, 115th Cong. 12 n.7 (2018). But despite these objections, the bill passed in its amended form. Thereafter, Representative Wagner acknowledged that the bill "f[ound] middle ground" by requiring that the

interactive computer service "knowingly facilit[ate] the sale of trafficking victims." 164 Cong. Rec. H1278, H1303 (daily ed. Feb. 27, 2018).

Plaintiffs might have had a viable argument had Congress passed the *original* version of FOSTA. But the language of that proposed law was too broad, so Congress chose narrower language exempting only some civil sex-trafficking claims—those where the interactive computer service provider that is the civil defendant committed a criminal violation. By ignoring the limiting language Congress added, Plaintiffs elevate specifically rejected language over the enacted text.

### c.    Plaintiffs' Policy Arguments Cannot Defeat the Plain Text, Context, and History of the Statute

Faced with the plain text of the statute, the statutory structure, and the clear enactment history, Plaintiffs resort to policy arguments. But courts cannot place policy above a statute's text. *FCStone Fin., Inc. v. Jacobson*, 950 F.3d 491, 499 (7th Cir. 2020). And these arguments are unavailing in any event.

The district court properly rejected Plaintiffs' argument that Salesforce's reading of section 230(e)(5)(A) would "'eviscerate' the civil negligence standard in § 1595." A21. As the court noted, this argument

49

misunderstands the underlying statutory scheme. Section 230 protects interactive computer service providers from being treated as a publisher or speaker of third-party content. A21-22. FOSTA was meant to create a limited exemption to the "otherwise broad" protections of section 230 to ensure the ability to bring certain types of sex-trafficking claims against interactive computer service providers that violate criminal sex-trafficking laws. *Id.*

It is reasonable that Congress, in order not to eviscerate section 230, created a higher standard for claims against such providers than against other types of defendants that might be sued under section 1595. "[L]aws often have more than one goal in mind." *Batzel v. Smith*, 333 F.3d 1018, 1028 (9th Cir. 2003). And when it comes to section 230 and FOSTA, victims' interests were not the only interests Congress considered. Congress also had to account for the vital role that section 230 plays in the modern fabric of the internet—where the imposition of a negligence standard for content would wreak havoc on the daily functioning of online services. Any arguments that the balance Congress struck produces unjust outcomes are better directed to Congress, not the courts.

50

\*     \*     \*

Section 230 bars Plaintiffs' claim against Salesforce because it would hold Salesforce liable for injuries caused by third-party content posted or transmitted on the internet. The language, context, and history of section 230(e)(5)(A) are clear: FOSTA revoked section 230 immunity only for section 1595 claims where the defendant's own conduct violates section 1591. To rule otherwise would create a circuit split, an outcome that "generally requires quite solid justification" because this Court "do[es] not lightly conclude that [its] sister circuits are wrong." *United States v. Tuggle*, 4 F.4th 505, 522 (7th Cir. 2021)—particularly where the sister circuit's view comports with that of an overwhelming majority of federal courts to address the question.

If this Court agrees with the Ninth Circuit and the district court's reading of FOSTA's immunity exception—*i.e.*, that it applies only when a plaintiff establishes the defendant's *own* conduct violates section 1591—that is sufficient to affirm because Plaintiffs concede that they have not alleged that Salesforce violated section 1591. OB55-56.

**B.    Even If Section 230 Did Not Apply, the Court Still Would Have to Affirm Because Plaintiffs Do Not Allege a Plausible Violation of Section 1595**

Even if section 230 did not bar Plaintiffs' claim, the judgment still should be affirmed under the district court's alternative holding that the complaint fails to state a claim.  To state a section 1595 claim, a plaintiff must plausibly allege that the defendant (1) "knowingly benefit[ed], financially or by receiving anything of value" (2) "from participation in a venture," which (3) "that person knew or should have known ha[d] engaged in an act in violation of" section 1591(a).  18 U.S.C. § 1595(a). The district court held that Plaintiffs had not established the last two elements because they "failed to allege plausibly that Salesforce knew, or should have known, about G.G.'s specific trafficking or any of the advertisements trafficking her on Backpage," or that Salesforce "'took part in' Backpage's sex-trafficking venture."  A31-34.  And because Plaintiffs do not allege that Salesforce derived any profits *because of* sex-trafficking ads on backpage.com, let alone ads posted as part of a venture to traffic G.G., Plaintiffs also cannot satisfy the "knowing benefit" requirement.  Because Plaintiffs cannot satisfy *any* element of section

1595, much less all three, they cannot state a claim against Salesforce under section 1595.

### 1. Plaintiffs Fail to Allege That Salesforce Participated in a Venture That Trafficked G.G.

The district court correctly held that Plaintiffs did not satisfy section 1595's "participation" requirement. After reviewing the statute and the cases addressing this element, the court found that "[p]articipation in a venture" requires "more than just passive facilitation" of that venture. A26. A plaintiff must allege facts sufficient to show that the defendant "active[ly] engage[d]" in the sex-trafficking venture, even if not in the actual act of trafficking itself. A26-27.

Section 1595 does not define "participation in a venture." But courts interpreting its "ordinary meaning" consistently hold that the defendant must "[t]ake part in a common undertaking or enterprise involving risk and potential profit" with the trafficker "as to the plaintiff." *Red Roof Inns, Inc.*, 21 F.4th at 724-25. Mere allegations that a defendant was somehow connected to and "financially benefitted" from a trafficking enterprise are insufficient. *Id*. at 726-27. Yet that is all Plaintiffs allege against Salesforce—that it received general revenue for its software (the same benefit it receives from all of its customers)

because of Backpage's use of Salesforce's software to manage its customer database.

Plaintiffs' theory of the venture affecting G.G., detailed in paragraph 112 of the complaint, is that Backpage facilitated G.G.'s trafficking through its illegal content sanitizing and reporting policies, and by building a website that charged a fee for hosting classified advertisements for sex-trafficking victims, including G.G.   SA28-29 ¶ 112(a)-(e).  But despite these detailed allegations of illegality against Backpage, linked directly to G.G. and involving corporate practices expressly intended to further such trafficking on its website, Plaintiffs never try to (nor could they) connect Salesforce or its software to any of those policies, to the trafficking aspects of Backpage's website, or to G.G.'s trafficking or her trafficker.  Rather, the claim against Salesforce is grounded in *Backpage's* back-end use of Salesforce's software to organize customer data and communicate with its actual and potential customers—activities that form no part of Plaintiffs' substantive allegations of wrongdoing against Backpage itself.  *Id*.

Plaintiffs acknowledge the district court applied the correct standard, OB46 (quoting A26), but argue that the court erred by

(1) ignoring the "continuous business relationship" between Salesforce and Backpage; (2) differentiating between Salesforce's own conduct and Backpage's use of Salesforce's technology; and (3) overlooking Plaintiffs' allegations that Salesforce gave "direct and personalized support" to Backpage that "enable[d] Backpage's use of Salesforce's technology." OB47-53. They also suggest that they should be entitled to discovery because, in their view, "the district court found [their] allegations to be insufficient on issues that were inherently fact laden." OB53. None of these arguments has merit.

***Continuous Business Relationship.*** Plaintiffs argue that, given the "undisputed, five-year continuous business relationship between Salesforce and Backpage," the district court should have found participation in a venture through "'a pattern of conduct'" suggesting "'a tacit agreement'" between the two. OB47 (quoting A27). But as the district court correctly recognized, such a continuous relationship or tacit agreement must be "as to the venture which the defendant knew, or should have known, involved sex trafficking." A27. The court never suggested that a general "continuous business relationship" between a defendant and an alleged trafficker, without more, satisfies section

1595's "participation" standard.  Quite the opposite—the court reiterated that, to plead a qualifying "business relationship" under section 1595, "a plaintiff must 'connect the dots' between their trafficking and the specific defendant."  A27.  Because Plaintiffs fail to do so here, they have not established Salesforce's participation in a trafficking venture.

The Eleventh Circuit's decision in *Red Roof Inns, Inc.*, 21 F.4th 714, is instructive.  There, the plaintiffs argued that the defendants (franchisors of hotels where victims were trafficked) "accommodated, facilitated, and participated" in sex trafficking, including the plaintiffs' "own sex trafficking." *Id.* at 717 (cleaned up).  According to the plaintiffs, the franchisors "investigated the individual hotels [where the plaintiffs were trafficked], took remedial action when revenue was down, read online reviews mentioning prostitution and crime occurring generally at the hotels, and controlled the training of managers and employees who were allegedly involved in facilitating sex trafficking at the hotels." *Id.* at 727.  Nonetheless, the Eleventh Circuit found those allegations "insufficient to state a claim" under section 1595 because they did not plausibly show the franchisors "participated in a … common undertaking or enterprise with the [plaintiffs'] sex traffickers or others at the hotel

56

who violated the statute." *Id.*; *see also B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at *5 (N.D. Cal. July 30, 2020) (dismissing complaint that was "devoid of any facts linking [defendant hotels] to the sex trafficking of this Plaintiff" because, absent that connection, it did not "make a plausible claim for [defendants'] direct 'participation in [a] venture'" (emphasis omitted)).

That makes this case easy, because Plaintiffs concede that "Salesforce did not have a direct relationship with G.G.'s individual trafficker." OB48. In fact, Plaintiffs devote an entire section of their brief to distancing Salesforce from the backpage.com ads that led to G.G.'s trafficking:

- "The third-party content at issue here appeared on Backpage, not on any Salesforce platform. Plaintiff nowhere alleges that Salesforce screened, edited, approved, removed, or otherwise made any decisions related to the third-party content on Backpage (or any other website)." OB24.

- "[I]t is undisputed that Salesforce did not publish or take action with respect to the third-party content on Backpage." OB26.

- "[T]he trafficking advertisements were actually posted to Backpage's website, and Backpage edited the advertisements to sanitize their content. SA28-29. Salesforce did not host the trafficking advertisements or exercise any editorial functions with respect to them." OB27.

- "Salesforce's software took no action with respect to the content posted on Backpage." OB32.

By Plaintiffs' own admission, Salesforce was not in a "continuous business relationship" with Backpage as to the venture that trafficked G.G. That is confirmed by the fact that the acts attributed to Salesforce— the provision of business software and technical support, and the sale of a "duplicate license" for overseas use—form no part of Plaintiffs' core allegations of Backpage's wrongdoing that support the "sex-trafficking venture" allegations against Backpage itself. *See* SA28-29 ¶ 112(a)-(e) (describing Backpage's practices of encouraging sex-trafficking ads on its website, earning fees from those ads, using content policies to "sanitize" ads to remove words suggesting sexual exploitation or trafficking, and prohibiting employees from reporting illegal ads). The absence of any overlap between the wrongful acts directly attributed to Backpage and any action by Salesforce is telling. Simply put, that Salesforce "provided its support to Backpage" under "multiple written contracts" for software does not establish Salesforce's "participation" in a sex-trafficking venture, including the "venture" that the complaint describes in detail in its claim against Backpage itself. OB48.

***Distinction Between Salesforce and Its Software.*** Plaintiffs also criticize the district court for distinguishing between actions taken by Salesforce as a company and those allegedly taken by Backpage using Salesforce's software. OB48-49. As Plaintiffs tell it, whatever Backpage did using Salesforce's software should be treated as Salesforce's own conduct. *Id.* That theory is unprecedented and alarming.

The district court correctly rejected this effort to equate Salesforce the entity with Salesforce the software. A32-33. That Backpage allegedly used the software to build a customer database and market to customers that allegedly included traffickers does not make Salesforce any more a "participant" in the wrongdoing than a paint manufacturer whose paints were used in an act of vandalism. *See, e.g.*, *United States v. Papagno*, 639 F.3d 1093, 1098 (D.C. Cir. 2011).

This Court has recognized that an intermediary company is not liable just because its product plays some role in a longer causal chain. "Does a newspaper that carries an advertisement for 'escort services' or 'massage parlors' aid and abet the crime of prostitution, if it turns out that some (or many) of the advertisers make money from that activity? How about Verizon, which furnishes pagers and cell phones to drug

dealers and thus facilitates their business?" *GTE Corp.*, 347 F.3d at 659. This Court has noted that companies that provided back-end support to Backpage, such as credit card companies, were "remote intermediaries." *Dart*, 807 F.3d at 234. Unsurprisingly, Plaintiffs point to no case adopting their strained view of "participation."

Apart from their illogical blurring of the line between Salesforce's conduct and Backpage's conduct using Salesforce's software, Plaintiffs provide no plausible allegation that Salesforce actively participated in *any* sex-trafficking venture. The district court, "[c]onsidering the complaint as a whole," found that "Plaintiffs allege that Backpage used Salesforce's CRM software to cultivate and expand a customer base of sex traffickers, including G.G.'s trafficker." A32. And even where the complaint "appear[ed] to suggest that Salesforce itself took actions to assist Backpage's efforts," "the factual allegations directly underlying these claims make it clear that Salesforce provided the technology (and corresponding technological support) that Backpage utilized to grow its own business." *Id.*

If there were any doubt from the complaint as to Salesforce's role (or lack thereof) in any illegal venture, Plaintiffs' own arguments would

dispel it. They insist that the content "at issue here appeared on Backpage, not on any Salesforce platform" and that Salesforce did not "ma[k]e any decisions related to the third-party content on Backpage (or any other website)." OB24. Plaintiffs thus disclaim any argument that anything relating to the core allegations against Backpage itself, *see* SA28-29 ¶ 112(a)-(e), is attributable to Salesforce.

Finally, even if Plaintiffs were correct that Salesforce could have learned about traffickers who advertised on the Backpage website, OB48-49, that is not the same as participating in a common undertaking with those who trafficked G.G. "[O]bserving something is not the same as participating in it." *Red Roof Inns, Inc.*, 21 F.4th at 727.

***"Direct and Personalized Support."*** Plaintiffs also accuse the district court of overlooking their allegations about "Salesforce's actions in providing direct and personalized support to a known sex trafficker to help that sex trafficker use Salesforce's products." OB51. But a court is not required to credit conclusory allegations, nor must it draw inferences in Plaintiffs' favor when the facts as alleged fail to "nudge[] their claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

The district court's careful analysis of the complaint was exactly right. It acknowledged that the complaint "contains multiple mentions of Salesforce providing Backpage with 'personalized services tailored specifically to the needs of its illegal business'"—but noted that "Plaintiffs provide no examples of these services, or description, or even suggestion, of how Salesforce altered its software to better facilitate sex trafficking." A33-34 (citing SA12 ¶ 46). The district court also correctly rejected as unsupported "labels and conclusions" Plaintiffs' characterization of Salesforce's software and services provided to Backpage as "unique," targeted, or "personalized," SA9-12, 14, ¶¶ 33, 40, 44, 46, 56. *See Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 664 (2009). The court was also correct that describing Salesforce's software as "customizable" by a customer does not mean Salesforce *itself* "customized" the software for anyone, including Backpage, much less tailored it specifically for sex trafficking. A34. Stripped of these conclusory allegations, the complaint makes clear that Salesforce sold generic software and offered generic technical support for an online advertiser. *See* SA8-9 ¶ 29-33. That does not "plausibly suggest[]"

62

unlawful conduct; in fact, it is equally (or more) consistent with entirely *lawful* conduct. *Twombly*, 550 U.S. at 557.

Plaintiffs emphasize their allegation that "Salesforce affirmatively assisted, supported, and facilitated Backpage in moving a duplicate copy of its system overseas for the purpose of evading law enforcement scrutiny." OB52 (quoting SA14-15 ¶ 56). The district court found this allegation inadequate, not just because Plaintiffs offer no basis for Salesforce's supposed knowledge of Backpage's motivations in seeking an additional software license, but because Plaintiffs alleged no harm to G.G. from any overseas activity. A34. On the first point, Plaintiffs say the complaint contains the missing allegations—that is, they "explicitly allege[] that Salesforce *knowingly* facilitated the system reorganization to move Backpage's operation overseas." OB52 (emphasis Plaintiffs'). But not only does this *not* allege knowledge of any illegal conduct, but with "no factual detail to support these conclusory allegations," Plaintiffs' claim of "knowledge" is nothing more than a textbook legal conclusion entitled to no weight. *Yeftich v. Navistar, Inc.*, 722 F.3d 911, 915-16 (7th Cir. 2013); *see also Iqbal*, 556 U.S. at 686.

Plaintiffs' response on the second point is also unconvincing. Recognizing that this "duplicate copy" for use overseas had no bearing on G.G.'s trafficking in Illinois, Plaintiffs suggest that "the duplicate copy allowed Backpage to evade law enforcement, thereby prolonging Backpage's ability to operate (and traffic victims like G.G.) before being seized by the government." OB53. But apart from the fact that this "duplicate copy" theory forms no part of the core wrongdoing alleged against Backpage itself, SA28-29 ¶ 112(a)-(e), such an attenuated assertion cannot establish "participation." Otherwise, a convenience store that sells disposable cell phones or a clothing store that sells an outfit used as a disguise—both of which can extend a wrongdoer's life on the run—could be swept up under this nearly limitless interpretation of "participation."

Plaintiffs' final contention is that their claim was prematurely dismissed because, "[w]ithout discovery, Plaintiff[s] cannot yet know the true extent of the relationship between Backpage and Salesforce and the various ways in which Salesforce supported Backpage." OB53. But a plaintiff is not entitled to discovery simply on a hunch. The "doors of discovery" are not "unlock[ed]" for plaintiffs "armed with nothing more

than conclusions." *Iqbal*, 556 U.S. at 678-79; *see also id.* at 686.  Because nothing in the complaint supports the "reasonable inference" that Salesforce participated in the venture that trafficked G.G. within the meaning of section 1595, *id.* at 678, Plaintiffs are not entitled to embark on a wild-goose chase and subject Salesforce to the burdens of discovery.

> **2.    Plaintiffs Do Not Allege That Salesforce Knew, Or Should Have Known, About G.G.'s Specific Trafficking**

Like numerous other courts across the country, the district court correctly held that section 1595 requires a plaintiff to plead that the defendant knew, or should have known, of the trafficking of the specific "person" (here, G.G.)—not just of the existence of an alleged trafficking venture generally.  A28-31.  Because Plaintiffs admit that they do "not allege that Salesforce knew about G.G.'s specific trafficking," OB54, they fail to plead this element of their claim.

The requirement that a defendant have specific knowledge comes from the plain text of sections 1595 and 1591.  Section 1595 requires that the defendant have "participat[ed] in *a* venture which that person … should have known has engaged in *an act* in violation of this chapter." 18 U.S.C. § 1595(a) (emphases added).  "[A]n act in violation of" section

65

1591 requires knowledge as to a specific victim, because it repeatedly refers to "the person" being trafficked, and requires knowledge of that person's specific circumstances, including that that "person" might be caused to engage in a commercial sex act by force or while underage. 18 U.S.C. § 1591(a). Plaintiffs do not dispute this. OB55.

Congress's use of "singular terms" in sections 1591 and 1595 was intentional. A29 (quoting *S.J. v. Choice Hotels Int'l, Inc.*, 473 F. Supp. 3d 147, 154 (E.D.N.Y. 2020)). By referencing a singular "act" and "venture," the statute requires that knowledge of a *particular* sex trafficking venture must be established. *S.J.*, 473 F. Supp. 3d at 154. Knowledge of a general sex trafficking problem in an industry is insufficient. *Doe 3 v. Red Roof Inns, Inc.*, 2020 WL 1872333, at *3 (N.D. Ga. Apr. 13, 2020). For instance, it is not enough that hotel franchisors know "that sex trafficking sometimes occurred on their franchisees' properties," because that does not give the franchisors a basis for actual or constructive knowledge of the singular "act in violation of" section 1591. *S.J.*, 473 F. Supp. 3d at 154; *see also Lundstrom v. Choice Hotels Int'l, Inc.*, 2021 WL 5579117, at *8 (D. Colo. Nov. 30, 2021). To rule otherwise "unjustifiably

bridges the scienter gap between 'should have known' and 'might have been able to guess.'" *S.J.*, 473 F. Supp. 3d at 154.

Plaintiffs argue that, because section 1595 does not itself reference "the person," "Congress did not create a victim-specific knowledge standard for civil Section 1595 claims." OB55. This, again, ignores the fact that the text, read in conjunction with neighboring provisions, itself contains the language they accuse the district court of adding. Section 1595 *explicitly* references "a venture" that violates section 1591, and that directly ties what the civil defendant "knew or should have known" to the violation with respect to the "person" described in section 1591.

Plaintiffs admit that the district court's ruling reflects the "'majority view' of the courts," but try to limit these cases, arguing that while those plaintiffs alleged specific knowledge, they were not required to do so. OB56. But there is no such limitation in those cases, all of which confirm the district court's reading of section 1595's "knew or should have known" element (emphases added):

- *B.M. v. Wyndham Hotels & Resorts, Inc.*, 2020 WL 4368214, at *5 (N.D. Cal. July 30, 2020): "Plaintiff must allege facts to support that [defendants], at the very least, rented rooms to people they *should have known were engaging in her sex trafficking*."

67

- *A.B. v. Marriott Int'l, Inc.*, 455 F. Supp. 3d 171, 192-93 (E.D. Pa. 2020): The plaintiff established the requisite knowledge because she "sufficiently allege[d] facts [that] Marriott's … hotels *knew or should have known about [her] trafficking*."

- *S.Y. v. Naples Hotel Co.*, 476 F. Supp. 3d 1251, 1257 (M.D. Fla. 2020): "[P]laintiffs allege each defendant knew or should have known about *the sex trafficking venture* based on the following…."

- *Lundstrom*, 2021 WL 5579117, at *8 (citations omitted): "Plaintiff alleges that defendant was on notice about the prevalence of sex trafficking generally at its hotels and in the hotel industry. But this is not sufficient to show that defendant *should have known about what happened to plaintiff*."

Plaintiffs offer a single case adopting their position: *M.L. v. Craigslist, Inc.*, 2020 WL 5494903, at *6 (W.D. Wash. Sept. 11, 2020). OB57. But *M.L.* provides virtually no reasoning to support its view that the plaintiff did "not need to allege that [C]raigslist knew specifically of her trafficking or of Plaintiff's specific identity." *Id.* The court did not address the statutory text or competing authorities; it just cited what it acknowledged was "dicta" from another decision. *Id.* That decision merely noted in a footnote that the hypothetical circumstance where a website operator "openly and knowingly makes a deal with sex traffickers to support the venture by posting advertisements featuring trafficked minors in exchange for a cut of the proceeds" might count as constructive

knowledge under section 1595, even if the operator might not know the identities of those being trafficked. *J.B. v. G6 Hosp., LLC*, 2020 WL 4901196, at *9 n.3 (N.D. Cal. Aug. 20, 2020). Nothing like that is alleged here.

Finally, Plaintiffs assert that "imposing a victim-specific knowledge requirement would severely curtail the beneficiary liability claim in Section 1595," as companies would "take precautions to avoid learning about any specific victim." OB56-57. These concerns are misguided. As the district court explained, the statute's "negligence standard" does not require a plaintiff to plead *actual* knowledge of a specific sex-trafficking venture. A28. "[E]ither actual or constructive knowledge" is sufficient. *Id.* A company cannot avoid beneficiary liability by burying its head in the sand if the exercise of reasonable diligence would have alerted it to a particular victim's trafficking. But that does not mean, as Plaintiffs suggest, that a company is liable even where nothing suggests it should have known about the victim's trafficking, just because it could have learned that other victims were trafficked at different times.

Under the correct standard, Plaintiffs' claim fails. They disclaim any allegation that Salesforce knew or should have known about G.G.'s

trafficking.  "[A]llegations that Salesforce knew or should have known that its venture with Backpage was engaged in violations of Section 1591," OB57, are insufficient.  For this reason alone, the district court's conclusion should be affirmed.

### 3.  Plaintiffs Do Not Allege That Salesforce Knowingly Received a Benefit From the Venture That Trafficked G.G.

The district court did not address whether Plaintiffs sufficiently alleged that Salesforce "knowingly benefited" from its participation in the venture that trafficked G.G.  The court agreed with Salesforce that a "knowing benefit" under section 1595 must flow directly from the alleged sex trafficking.  A25 (citing *B.M.*, 2020 WL 4368214, at *4).  And although the court clarified that "benefits" need not necessarily be "profits," a plaintiff must plead "a causal relationship between the [defendants'] participation in sex trafficking and their purported benefit." *Id.*

Plaintiffs contend that the district court "rejected Salesforce's argument that the profit must be derived specifically because of Salesforce's facilitation of trafficking." OB59.  That is wrong—the court did the opposite, holding that section 1595 requires a plaintiff to establish "that the defendant knew that it was receiving benefits (financial or

70

otherwise) because of its participation in a venture that violated § 1591." A25. In other words, a plaintiff must allege facts sufficient to show "a causal relationship" between the defendant's "affirmative conduct furthering the sex-trafficking venture and receipt of a benefit," and that the defendant received the benefits with "knowledge of that causal relationship." *Geiss v. Weinstein Co. Holdings LLC*, 383 F. Supp. 3d 156, 169 (S.D.N.Y. 2019).

Plaintiffs offer two cases for their reading of the "knowing benefit" standard, but both comport with the rule the district court applied. OB59. In both cases, the defendants earned revenues from renting rooms to traffickers. In *M.A. v. Wyndham Hotels & Resorts, Inc.*, 425 F. Supp. 3d 959, 965 (S.D. Ohio 2019), the court explained that because revenue "constitute[d] a financial benefit from [the defendants'] relationship with the trafficker," her allegations were sufficient to plead the receipt of a "knowing benefit." *Id.* In Plaintiffs' other case, *H.H. v. G6 Hosp., LLC*, 2019 WL 6682152 (S.D. Ohio Dec. 6, 2019), the court found it sufficient for the plaintiff to allege that the defendants earned revenue from renting a room to her trafficker. *Id.* at *2.

71

Unlike Plaintiffs' cases, where the hotels were alleged to have knowingly received a financial benefit (rental revenue) from their participation in each plaintiff's *own* trafficking, this case involves no allegations of a direct, causal relationship between trafficking and benefit. In fact, Plaintiffs argue they need not show that Salesforce "derived any profit specifically because of the alleged facilitation of Backpage sex-trafficking ads business" or "ads specifically posted as part of a venture to traffic G.G." Dkt. 66 at 29. According to Plaintiffs, it is enough to allege that Salesforce "received a benefit through selling its services to Backpage"—specifically, that Salesforce had "paying contracts with Backpage" and to assert, generically, that "Salesforce's profits increased as it sold additional licenses, data storage, and other features to Backpage." OB60. But as this Court recognized, not all ads on Backpage are for illicit activities, let alone for sex trafficking; in fact, many "advertise indisputably legal activities." *Dart*, 807 F.3d at 230. Without tying these vague "benefits" or "profits" to any venture that trafficked G.G., Plaintiffs cannot satisfy the "knowing benefit" element of section 1595.

72

# VIII. CONCLUSION

This Court should affirm the judgment in its entirety.

Dated:  December 5, 2022

Respectfully submitted,

By:  _/s/ Kristin A. Linsley_____
     Kristin A. Linsley

Patricia Brown Holmes
Lucas T. Rael
RILEY SAFER HOLMES & CANCILA LLP
70 W. Madison Street, Suite 2900
Chicago, IL 60602
Telephone:  (312) 472-8700
Facsimile:  (312) 471-8701
pholmes@rshc-law.com
lrael@rsch-law.com

Bradley J. Hamburger
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071-3197
Telephone:  (213) 229-7658
Facsimile:  (213) 229-6658
bhamburger@gibsondunn.com

Kristin A. Linsley
    _Counsel of Record_
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA 94105-0921
Telephone:  (415) 393-8395
Facsimile:  (415) 374-8471
klinsley@gibsondunn.com

Andrew LeGrand
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, TX 75201
Telephone:  (214) 698-3100
Facsimile:  (214) 571-2900
alegrand@gibsondunn.com

_Counsel for Appellee Salesforce, Inc. (formerly known as Salesforce.com, Inc.)_

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPESTYLE REQUIREMENTS

1.    This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(c) because this brief contains 13,998 words, as determined by the word-count function of Microsoft Word, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Circuit Rule 32(b) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point New Century Schoolbook font.

Dated:  December 5, 2022

By:  _/s/ Kristin A. Linsley_____
          Kristin A. Linsley

## CIRCUIT RULE 30(d) STATEMENT

The undersigned attorney hereby certifies, pursuant to Circuit Rule 30(d), that all material required under Circuit Rule 30(a) and (b) is included in the Short Appendix and the Appendix submitted together with this brief.

Dated:  December 5, 2022

By:  */s/ Kristin A. Linsley*
Kristin A. Linsley

## CERTIFICATE OF SERVICE

I certify that on December 5, 2022, I filed the foregoing answering brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit through the appellate CM/ECF system, which will send a notification of such filing to the following counsel of record:

| | |
|---|---|
| Peter J. Flowers | Warren W. Harris |
| pjf@meyers-flowers.com | Counsel of Record |
| MEYERS AND FLOWERS, LLC | warren.harris@bracewell.com |
| 3 North Second Street, Suite 300 | Walter A. Simons |
| St. Charles, Illinois 60174 | walter.simons@bracewell.com |
| Telephone: (630) 232-6333 | BRACEWELL LLP |
| | 711 Louisiana Street, Suite 2300 |
| | Houston, Texas 77002-2770 |
| | Telephone: (713) 223-2300 |

*Attorneys for Plaintiffs–Appellants*

Dated: December 5, 2022

By: _/s/ Kristin A. Linsley_____
Kristin A. Linsley